UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JAMES MUSLOW, III                              CIVIL ACTION NO. 17-1038

VERSUS                                         JUDGE ELIZABETH E. FOOTE

CITY OF SHREVEPORT, ET AL.                     MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Plaintiff James Muslow ("Plaintiff") brings this action under 42 U.S.C. § 1983 and Louisiana tort law to recover damages for the alleged excessive use of force by officers of the Shreveport Police Department ("SPD"). Now pending before the Court is a Second Motion for Summary Judgment [Record Document 38] filed by Defendants Tyler Kolb ("Kolb"); Daniel Meyers ("Meyers"); Alan Crump, Chief of Police for the City of Shreveport ("Crump"); and the City of Shreveport ("the City") (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes the motion. [Record Document 42]. For the reasons discussed below, the motion for summary judgment [Record Document 38] is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to Muslow's state law tort claims of negligent hiring and intentional infliction of emotional distress. Those claims are hereby **DISMISSED WITH PREJUDICE**. The motion is **DENIED** as to all of Muslow's remaining claims.

## FACTUAL BACKGROUND

On the evening of September 12, 2016, SPD officers Kolb and Meyers were dispatched to a residence in Shreveport's Highland neighborhood where Muslow and his wife, Kelly, were allegedly involved in an altercation with the residents of the home. Record Document 38-2, ¶s 1–2. The residents told Kolb that Kelly had a gun and was acting aggressively with it. *Id.* at ¶ 3. Muslow and Kelly left the scene while the officers were present, and no further investigation was

1

conducted. *Id.* at ¶ 4. Muslow concedes most of these facts, but clarifies that one of the residents of the home had been in an altercation with Kelly, and Muslow had been requested to come over and calm down that resident. Record Document 43, ¶ 2. Muslow also states that Kelly never had a gun, that no gun was found on the scene or in her car, and that the residents of the home advised the officers that Muslow and Kelly had permission to be there. *Id.* at ¶s 3–4.

Defendants state that, less than an hour later, Kolb and Meyers, along with Officer Jess Camp ("Camp") and Sergeant Jeffrey Brown ("Brown"), were dispatched to another house in an adjacent neighborhood in response to a "shots fired" call. Record Document 38-2, ¶s 5–6. Two neighbors told the officers that they heard gunshots coming from inside the house or the backyard, and one neighbor stated that the occupants of the house were known narcotics abusers. *Id.* at ¶ 7. Kolb saw Kelly exit the residence and recognized her from the previous call. *Id.* at ¶ 8. Brown and another officer, Sergeant Lee Pittman ("Pittman"), determined that the officers needed to search the residence and the backyard to make sure that no one was injured. *Id.* at ¶ 10. This is known as a "welfare check." *Id.* at ¶ 19.

As the officers approached the residence, Muslow existed the front door and began recording them with his cell phone. *Id.* at ¶ 11. Kolb requested to pat down Muslow to make sure he was unarmed. *Id.* at ¶ 12. After the pat down, Kolb asked Muslow about the location of the gun that Kelly allegedly possessed during the earlier altercation in the Highland neighborhood. *Id.* at ¶ 13. Muslow stated that there had never been a gun. *Id.* Kolb then explained that the officers were there to investigate a shots fired call, and stated that "[c]oincidentally, about 30 minutes ago, we contacted y'all and you had a weapon in your vehicle." *Id.* at ¶ 14. Again, Muslow asserts that there was no weapon in Kelly's vehicle, no weapon recovered from the scene, and no weapon found on his person after Kolb's pat down. Record Document 43, ¶ 14

Defendants claim that when Kolb asked Muslow about the location of another occupant of the residence, Muslow responded, "he's inside, he ain't coming out here and y'all ain't going in there unless you got a warrant." Record Document 38-2, ¶ 15. Muslow asserts that he said this after Kolb asked where Muslow's dog was. Record Document 43, ¶ 15. Meyers told Muslow that the officers just wanted to get in the backyard, but Muslow refused them entry. Record Document 38-2, ¶ 16. Brown stepped towards Muslow, asked him to stand next to Kolb, and informed Muslow that the officers were going to enter the house. *Id.* at ¶ 17. Muslow stated repeatedly, "you're not going in my house," to which Brown responded, "yeah we are." *Id.* at ¶ 18. Muslow then stepped into the doorframe to block the officers from entering the residence. *Id.* at ¶ 19.

The parties provide differing accounts of what happened next. Defendants claim that Brown grabbed Muslow's wrist in a "control hold" to escort him away from the door, but Muslow jerked away. *Id.* at ¶ 20. This prompted Kolb to grab Muslow around his upper body and bring him to the ground. *Id.* at ¶ 21. Defendants state that, once on the ground, Muslow aggressively resisted Kolb and continued to attempt to record the events with his cell phone. *Id.* at ¶ 24. Camp allegedly saw Muslow kicking and grabbed his legs to prevent injury to the other officers. *Id.* at ¶ 25. The officers instructed Muslow to put his arms behind his back, and Kolb attempted to pull Muslow's left arm behind his back, but Muslow pulled away. *Id.* at ¶ 26. Defendants assert that Kolb then delivered two or three short, quick strikes, also known as punches, to Muslow's facial area, after which Kolb and Meyers were able to place Muslow in handcuffs.[1] *Id.* at ¶ 27.

---

[1] There appears to be a factual issue as to whether Meyers participated in the takedown. Muslow's filings are inconsistent on this point. Muslow's second amended complaint and opposition state that Kolb and Meyers "body slammed" him onto his porch. Record Documents 34, ¶ 11; 42, p. 5. Muslow testified at his deposition that he believed Kolb and Meyers body slammed him. Record Document 30-3, p. 55. However, Muslow's response to Defendants' statement of uncontested facts does not contain an allegation that Meyers was involved in the takedown—only Kolb. Record Document 43, ¶ 20.

Muslow's version of events is vastly different. In contrast to Defendants' statement that Muslow jerked away from Brown's control hold, Muslow asserts that, after Brown informed him that the officers were going to enter the house, Pittman "lightly placed his hand" on Muslow's shoulder and Muslow advised the officers that he did not want them entering his house. Record Document 43, ¶ 20. After this statement, Muslow claims that Kolb slammed him to the ground. *Id.* at ¶ 21. Muslow testified in his deposition that he was no longer blocking his doorway when the takedown occurred. Record Document 30-3, pp. 45 & 52–53. Once on the ground, Muslow contends that he did not kick an officer or resist aggressively and that he could not have resisted at all because he began to lose consciousness after being taken to the ground. Record Document 43, ¶s 24–26. Muslow claims that both the takedown and the punches constituted unreasonable and excessive force and that he could have easily been escorted away from his front door without such force. *Id.* at ¶s 23, 29, 35, & 40.

The Shreveport Fire Department was called to the scene to treat Muslow for injuries he sustained during this encounter. Record Document 38-2, ¶ 31. Muslow was transferred to University Health and diagnosed with a fracture of the orbital floor and a bilateral mandibular fracture. *Id.* at ¶ 32. The mandibular fracture was surgically repaired on September 27, 2016. Record Document 34, ¶ 13.

## PROCEDURAL BACKGROUND

Muslow filed the instant lawsuit against the City, as well as Crump, Kolb, and Meyers in their individual and official capacities. Record Document 1. Muslow alleged that the City and Crump acted with deliberate indifference to his constitutional rights and in violation of 42 U.S.C. § 1983 by (1) failing to properly train SPD officers and (2) maintaining a variety of unconstitutional

policies, practices, and customs at SPD.[2] *Id.* at ¶s 14–23.  Muslow further alleged that all Defendants were liable to him for the Louisiana state law torts of battery, assault, intentional infliction of emotional distress, and negligent hiring, training, and supervision. Record Document 1, ¶s 24–47.

Defendants moved for summary judgment on all of Muslow's claims. Record Document 22, pp. 1–2. The Court granted the motion as to the official capacity claims against Kolb, Meyers, and Crump, and as to the failure to train claims against Crump and the City. Record Document 33, p. 1. The Court denied the motion as to all of Muslow's other claims. *Id.* The Court found that Muslow had not presented sufficient evidence to survive summary judgment on his failure to discipline claim but allowed further discovery as to that claim only. *Id.* at 12–13.

The Court also noted that, despite arguing in his opposition that Kolb and Meyers should be liable under the Fourth Amendment for the use of excessive force, Muslow's complaint did not allege a Fourth Amendment violation against Kolb or Meyers. *Id.* at 17. The Court allowed Muslow to file an amended complaint to include an excessive force claim. *Id.* at 18 (citing *Riley v. School Bd. Union Parish*, 379 F. App'x 335, 341 (5th Cir. 2010) (per curiam) (stating that when a claim is raised for the first time in response to a motion for summary judgment, the district court should construe the claim as a motion to amend under Federal Rule of Civil Procedure 15(a)). Muslow has now filed an amended complaint asserting (1) that the City and Crump are liable under § 1983 for maintaining a number of unconstitutional policies, practices, and customs at SPD; (2) that Kolb and Meyers are liable under § 1983 for the use of excessive force in violation of the Fourth Amendment; and (3) that Defendants are liable for the Louisiana state law torts of assault, battery, intentional

---

[2] Muslow claims, and Defendants admit, that SPD is a department of the City of Shreveport. Record Documents 1, ¶ 6; 5, p. 2.

infliction of emotional distress, and negligent hiring and/or supervision. Record Document 34, ¶s 14–50. Defendants responded by filing the instant motion for summary judgment on all remaining claims. Record Document 38, pp. 1–2.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. *See id.* at 322–23. However, "if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the non-movant must demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings" and "designat[ing] specific facts" for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with some metaphysical doubt as to the material facts," by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence." *Id.* (internal quotation marks and citations omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes*

*v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the non-movant is so "weak or tenuous" that it could not support a judgment in the non-movant's favor. *Armstrong v. City of Dall.*, 997 F.2d 62, 67 (5th Cir. 1993).

Additionally, Local Rule 56.1 requires the movant to file a statement of material facts as to which it "contends there is no genuine issue to be tried." The opposing party must then set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." W.D. La. R. 56.2. All material facts set forth in the movant's statement "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." *Id.*

## LAW AND ANALYSIS

The Court will first evaluate Muslow's claim that Kolb and Meyers violated his Fourth Amendment right to be free from the use of excessive force. The Court will then turn to Muslow's claims against Crump in his supervisory capacity and against the City for its allegedly unconstitutional policies, practices, or customs. The Court will finish by analyzing Muslow's state law claims.

## I.     Excessive Force Claim

### A.     Qualified Immunity Analysis

Title 42, United States Code, Section 1983 provides a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States against any person acting under color of state law. 42 U.S.C. § 1983. Section 1983 does not create substantive rights but provides remedies to the rights established in the United States Constitution and other federal laws. *See Graham v. Connor*, 490 U.S. 386, 393–94 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To assert a claim for damages under this statute,

a plaintiff must demonstrate "(1) a deprivation of a right secured by federal law, (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004). Nonetheless, the doctrine of qualified immunity shields government officials from liability for claims against them in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This protection exists to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability, . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the issue of whether qualified immunity applies should be resolved at the earliest possible stage in the litigation. *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). While qualified immunity is technically an affirmative defense, it is the plaintiff's burden to negate the defense once it has been raised. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The issue of qualified immunity requires the Court to make a two-part inquiry: (1) whether the facts alleged or shown by the plaintiff demonstrate a violation of a constitutional right, and (2) if a violation has been established, whether the officer's actions were objectively reasonable in light of clearly established law at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court may begin its analysis of qualified immunity with either prong. *Gibson v. Kilpatrick*, 773 F.3d 661, 666 (5th Cir. 2014). At the summary judgment stage, a plaintiff satisfies the first prong by establishing that "genuine issues of material fact exist regarding the

reasonableness of the official's conduct." *King v. Handorf*, 821 F.3d 650, 654 (5th Cir. 2016) (quoting *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008)). This proof need not be "absolute," but must consist of more than "mere allegations." *Id.* (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)). The second prong requires that "[t]he constitutional right must be sufficiently clear to put a reasonable officer on notice that certain conduct violates that right." *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998). A public official may assert the defense of qualified immunity even though a plaintiff's civil rights have been violated, provided that the official's conduct was objectively reasonable. *Id.* at 467. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).

To be clearly established, a legal principle must be found in the holdings of either "controlling authority" or a "robust 'consensus of cases of persuasive authority,'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)), and defined with a "high 'degree of specificity,'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)). However, the cases relied upon need not be identical. There may be "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). This "clearly established" test ensures that officials have "fair warning" that particular conduct violates the Constitution. *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016) (quoting *Kinney*, 367 F.3d at 350).

The constitutional right at issue in this case arises from the Fourth Amendment, which "creates a 'right to be free from excessive force during a seizure.'" *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Poole*, 691 F.3d at 627). The Court must consider whether, viewing all facts in the light most favorable to Muslow, the actions of Kolb and Meyers violated his right to be free from excessive force. If Muslow establishes such a violation, the Court will then analyze whether the right was clearly established at the time of the alleged misconduct.

### 1.   Constitutional Violation

To prove an excessive force claim, Muslow must show "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)). Excessiveness turns upon whether the degree of force used was reasonable in light of the totality of the circumstances facing the officer in each case. *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Relevant factors include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* These are known as the *Graham* factors. When deciding whether to use force, officers must determine "not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). The reasonableness of the officers' conduct cannot be judged with the benefit of hindsight, but must be assessed from the viewpoint of a reasonable officer on the scene at that very moment. *See Graham*, 490 U.S. at 396. Indeed,

> [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment. The calculus of

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97 (internal citations and marks omitted). "Excessive force claims are [thus] necessarily fact-intensive and depend[ ] on the facts and circumstances of each particular case." *Poole*, 691 F.3d at 628 (internal citations and marks omitted). The facts must be judged objectively "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397.

In this case, Defendants do not contest that Muslow was injured as a result of his encounter with Kolb and Meyers. Instead, they maintain that although the injuries may "appear severe, they are common" and could result from very little force.[3]  Record Document 38-1, p. 21. Nevertheless, Defendants' statement of uncontested material facts admits that Muslow's injuries were caused by the officers' use of force. Record Document 38-2, ¶ 31. Thus, the Court must determine whether the force used by the Defendant officers was excessive and unreasonable.[4]

The parties appear to agree that the two uses of force at issue in the instant case are (1) Kolb's and possibly Meyers's takedown of Muslow and (2) Kolb's subsequent distraction strikes or punches to Muslow's face.  The Court must consider the *Graham* factors, which include the

---

[3] These assertions are based on the deposition of a dentist named Andrew Banker ("Banker") who treated Muslow and a medical report prepared by Defendants' expert witness Dr. Thomas Arnold ("Arnold"). Record Document 38-1, p. 21. Banker testified that Muslow's mandibular fracture could have been caused by a "fall from standing" and that the area of Muslow's jaw that was fractured is a "very common place for a fracture to occur." Record Document 38-4, pp. 153 & 155. Arnold's report stated that the orbital floor bones are fragile and that "fractures of the orbital floor are common and may occur with relatively minor force to the orbital globe." *Id.* at 160–61.

[4] In analyzing whether the use of force was clearly excessive and unreasonable, the Court must consider "each officer's actions separately, to the extent possible." *Poole*, 691 F.3d at 628. While this opinion will primarily refer to Kolb and Meyers as the individuals who performed the takedown, as noted above, it is apparent that there are genuine unresolved issues of fact as to whether Meyers helped Kolb take Muslow to the ground. Therefore, while a jury may ultimately find that Kolb is the only officer responsible for the takedown, the Court cannot make such a determination at this stage.

severity of the crime at issue, whether Muslow posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. As discussed below, the parties have demonstrated a number of disputes of material fact, such as whether Muslow resisted the officers by jerking away from Brown, whether or how much Muslow resisted Kolb while on the ground, and whether Muslow actually presented a danger to the police officers or others.  Taking the facts in the light most favorable to Muslow, the Court finds that a reasonable jury could conclude that the use of force in this case was excessive and objectively unreasonable.

### a.      Reasonableness of the Takedown

As to the first *Graham* factor, the severity of the crime at issue, Defendants argue that it weighs in their favor because the officers initially arrived at Muslow's home to investigate a report that shots had been fired. Record Document 38-1, p. 21. Although a report of shots fired may be a serious occurrence, the officers did not have any confirmation that a crime occurred. Moreover, any weight that this argument may carry is undercut by the fact that the officers had no reason to suspect Muslow specifically of a crime when they encountered him exiting the front door of his home. Because Muslow was not suspected of a crime when the takedown occurred, this factor weighs in Muslow's favor and against the reasonableness of the takedown.

Defendants' argument regarding the second *Graham* factor, whether Muslow posed an immediate threat to the safety of the officers or others, similarly relies on the fact that the officers were on the scene to investigate a shots fired call. They argue that Muslow posed a threat to the safety of others by blocking the doorway to his home and attempting to prevent the officers from performing a welfare check. *Id.* Muslow admits that he initially blocked his doorway when the officers arrived. Record Document 43, ¶ 19. However, he testified in his deposition that after

Pittman requested that he move aside, he complied and was standing next to Kolb when he was taken to the ground. Record Document 30-3, pp. 45 & 52–53. Furthermore, Muslow's cell phone video of this interaction supports his version of events. *See* Record Document 42-2. Toward the end of the video, an officer asks Muslow to step aside and stay with another officer. *Id.* at 1:12. Muslow can be heard saying "mhm" in response. *Id.* at 1:15. Although the video is dark, it appears to indicate that Muslow moved in response to the officer's request and can be heard saying "you're not going in my house." *Id.* A few seconds later, the camera begins shifting around and sounds indicate that a struggle took place. *Id.* at 1:20. Because the Court must resolve disputed questions of fact in Muslow's favor, the Court infers that prior to being taken to the ground, Muslow was not blocking the officers from entering his home and was not posing an immediate threat to anyone's safety. Therefore, the second *Graham* factor weighs against the reasonableness of the takedown.

Finally, Defendants argue that the third *Graham* factor, whether Muslow was actively resisting arrest or attempting to evade arrest by flight, weighs in their favor because the officers "reasonably perceived Muslow's actions as active resistance." Record Document 38-1, p. 21. Upon a review of the evidence, the Court believes that a reasonable jury could find that the Defendants' version of events fails to withstand scrutiny on this point. Prior to the takedown, the only action that Defendants allege Muslow took that could be described as resistance is jerking his arm away from Brown's control hold. *See* Record Document 38-2, ¶ 20. However, Muslow denies that Brown ever placed him in a control hold. Record Document 43, ¶ 20. If Muslow did not jerk his arm away from Brown, there is nothing in the record to show that he was actively resisting Kolb. Consequently, the third *Graham* factor also weighs against a finding that the takedown of Muslow was a reasonable use of force.

In addition to the reasonableness of the takedown itself, the speed with which it was implemented is relevant to whether Muslow's rights were violated. The Fifth Circuit has stressed that a relevant consideration in determining whether an officer's force was excessive to the need is the "speed with which an officer resorts to force . . . ." *Trammell*, 868 F.3d at 342. If he resorts to force too quickly before employing other negotiation tactics or attempting "measured and ascending" responses commensurate with the plaintiff's conduct, then those circumstances militate against a finding of reasonableness. *Id.* Thus, the speed with which Kolb and Meyers resorted to force is another consideration to be made by the jury in this matter.

> b.     *Reasonableness of the Punches*

The Court finds that Muslow has also raised a genuine issue of material fact as to whether Kolb's use of punches or distraction strikes was reasonable. When Kolb punched him, Muslow was still not suspected of any crime and therefore the first *Graham* factor weighs in Muslow's favor. Moreover, because Muslow could not have been blocking his doorway once he was on the ground, Defendants cannot argue that the punches were justified by the fact that he was threatening the safety of others by preventing the officers from performing a welfare check. Neither have Defendants presented any evidence that Muslow represented a threat to officer safety. Defendants admit that Kolb patted Muslow down to make sure he was unarmed before any force was used. Record Document 38-2, ¶s 12–13. Defendants' statement of uncontested facts also shows that when he was on the ground, Muslow was outnumbered three to one by Kolb, Meyers, and Camp. *Id.* at ¶s 25 & 27. Also significant is the size differential between Muslow and Kolb. Kolb testified that he is 6'7" tall and that his weight fluctuates between 275 to 290 pounds, whereas Muslow testified that he is 6'1" tall and weighed 150 pounds at the time of the incident. Record Documents 30-3, p. 46; 42-13, p. 2.  Thus, the second *Graham* factor weighs in Muslow's favor because a jury could

find that Kolb could not have reasonably believed that Muslow posed a threat to the safety of the officers or others once he was on the ground.

As to the third *Graham* factor, Defendants assert that once Muslow was on the ground, he "continued trying to film the events with his cell phone and aggressively resisted Officer Kolb," attempted to kick the officers, refused to obey Kolb's commands to put his hands behind his back, and attempted to jerk his arm away from Kolb. Record Document 38-2, ¶s 24–26. In contrast, Muslow claims that he never kicked an officer, that he never resisted aggressively, and that he could not have resisted because he was losing consciousness as a result of the takedown. Record Document 43, ¶s 24–26. Muslow did admit in his deposition that his arms likely flailed with the rest of his body once he reached the ground. Record Document 30-3, p. 57.

Making all reasonable inferences in Muslow's favor, the Court concludes that a reasonable jury could find that he was at most minimally resisting Kolb's attempts to place him in handcuffs. Based on Muslow's assertion that he was beginning to lose consciousness after hitting the ground, and the fact that one of his hands was still holding his cell phone, his resistance was unlikely to have been forceful or aggressive. The Court finds that Kolb's use of punches to gain control of Muslow's arms when confronted with such minimal resistance was unreasonable, especially because Muslow did not pose a threat to anyone's safety and was not suspected of any crime.

In addition to the punches themselves, another factor to consider when evaluating reasonableness is that officers are required to not only assess the need for force in the first place, but also assess the relationship between the need for force and the amount of forced used. *Deville*, 567 F.3d at 167. Thus, a reasonable jury could find that Kolb punching Muslow in the face two to three times because Muslow allegedly jerked his arm away to avoid being handcuffed was out of

proportion with the amount of force required to subdue Muslow, a much smaller, unarmed man who was outnumbered by three police officers.

     2.    <u>Clearly Established Law</u>

Now that Muslow has established a genuine issue of material fact as to whether he suffered a violation of his Fourth Amendment right to be free from the use of excessive force, the Court will consider the second prong of the qualified immunity analysis, that is, whether the officers' actions were objectively reasonable in light of clearly established law. Although fact questions prevent summary judgment on the question of whether Kolb and/or Meyers violated Muslow's Fourth Amendment rights, they may still be released from suit on this claim if they are entitled to qualified immunity.

With regard to the initial takedown of Muslow, by 2013 it was clearly established that "violently slam[ming] an arrestee who is not actively resisting arrest" is a constitutional violation. *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 731 (5th Cir. 2018) (citing *Ramirez v. Martinez*, 716 F.3d 369, 377–78 (5th Cir. 2013); *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)). In fact, the Fifth Circuit has repeatedly denied qualified immunity in cases in which "officers face verbal resistance but no fleeing suspect." *Bone v. Dunnaway*, 657 F. App'x 258, 263 (5th Cir. 2016) (per curiam) (citing *Deville*, 567 F.3d at 169; *Bush*, 513 F.3d at 502; *Goodson*, 202 F.3d at 734, 740). In this case, Muslow was not an arrestee and therefore could not have been resisting arrest when his interaction with the officers began. Based on Muslow's version of the facts, he was providing only passive verbal resistance to the officers' instructions and was not attempting to flee when he was taken to the ground. Thus, qualified immunity does not shield Kolb and Meyers from liability for the takedown because any

reasonable officer in their position would have known that the takedown was unconstitutional under clearly established law.

The Court also finds that Kolb is not entitled to qualified immunity for the force used against Muslow on the ground. Muslow asserts that he could not have been resisting Kolb on the ground because he was losing consciousness but does admit that his arms were likely flailing. Even if it were reasonable for Kolb to perceive this flailing as Muslow jerking his arm away to avoid being handcuffed, the Fifth Circuit has refused to characterize the pulling away of one's arm from an officer's grasp as active resistance. *Goodson*, 202 F.3d at 734 & 740. In *Goodson*, the officers lacked reasonable suspicion to detain or frisk the plaintiff, and he was not fleeing; therefore, the Fifth Circuit declined to find that his decision to pull his arm away from the officers justified their use of force. *Id.*; *see also Trammell*, 868 F.3d at 343 (holding that by at least 2000, it was clearly established law that it was "objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp."); *Ramirez*, 716 F.3d at 378–79 (holding that a reasonable officer would find the defendant-officer's use of force to be clearly excessive and unreasonable where, under the plaintiff's version of the facts, he resisted only by pulling his arm away from the defendant-officer's grasp).

In support of their qualified immunity argument, Defendants argue that this case is factually and legally similar to *Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016). In *Griggs*, the plaintiff brought a § 1983 claim alleging that a police officer ("Brewer"), who arrested him for driving while intoxicated, used excessive force in effecting his arrest. *Id.* at 310–11. Brewer pulled Griggs's vehicle over after observing him running a red light and conducted field sobriety tests for fifteen minutes before deciding to arrest him. *Id.* at 311. When Brewer attempted to handcuff Griggs,

Griggs lurched to the side and said "no, no," which prompted Brewer to perform a takedown. *Id.* Brewer then "punched Griggs with a closed fist to the back of his head" after Griggs refused to put his hands behind his back. *Id.* The Fifth Circuit held that its precedent did not clearly establish that the takedown Brewer performed, "against a drunken, erratic suspect who [was] resisting arrest," was constitutionally unreasonable. *Id.* at 314. The court also found that Brewer was entitled to qualified immunity for punching Griggs several times while on the ground in an attempt to handcuff him because "there was no settled authority to put Brewer on notice that his use of force in such circumstances violated Griggs' constitutional rights." *Id.* at 315.

The instant case is distinguishable from *Griggs* because, unlike Griggs, Muslow was not suspected of a crime, was not drunk or acting erratically, and was not told that he was being placed under arrest. Kolb and Meyers had no reason to believe Muslow was resisting arrest when they performed the takedown. Muslow asserts that his limbs may have been flailing once on the ground but maintains that he could not have resisted arrest because he was losing consciousness, whereas Griggs resisted by pulling his arms away after being told repeatedly to put his hands behind his back. *Id.* at 311. Thus, the holding of *Griggs* does not mandate a finding that the actions of Kolb and Meyers are protected by qualified immunity.

Here, the clearly established law shows that Muslow's verbal resistance to the officers entering his home and his flailing after being taken to the ground cannot justify the force that was used. Because using force against someone who is not actively resisting arrest is in violation of clearly established law, Kolb and Meyers are not entitled to qualified immunity from Muslow's excessive force claim. Even if some degree of force was warranted in this case, a reasonable jury could still find that the force used was at odds with clearly established law because (1) the amount of force used was out of proportion with the amount of force needed and/or (2) the force was used

too quickly and before any real attempt was made to negotiate with Muslow. *See Deville*, 567 F.3d at 167; *Trammel*, 868 F.3d at 343 (citing *Poole*, 691 F.3d at 629). Summary judgment is thus inappropriate and the motion [Record Document 38] is hereby **DENIED** as to Muslow's excessive force claim.

## II.    <u>Failure to Discipline Claim</u>

### A.    **Municipal Liability under § 1983**

Now that the Court has determined that a genuine issue of material fact exists as to whether Muslow's Fourth Amendment rights were violated, it will now evaluate whether this violation was caused by a policy or custom established by the City. Again, § 1983 provides a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States against any person acting under color of state law. 42 U.S.C. § 1983. The Supreme Court has held that municipalities such as the City are "persons" within the meaning of § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, a municipality cannot be sued under § 1983 based on a theory of *respondeat superior* for a constitutional tort committed by one of its employees. *Id.* at 691. A municipality is only responsible for a constitutional harm if the execution of one of its customs or policies caused the injury. *Id.* at 694.

To impose liability on a municipality under § 1983, a plaintiff must prove the existence of three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy. *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). Requiring a plaintiff to identify an official policy ensures that municipalities will only be held liable for constitutional violations that result from the decisions of government officials whose acts can be fairly attributed to those of the municipality itself. *Bryan Cty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997).

To satisfy the "official policy" element of a *Monell* claim, a plaintiff may either point to a policy statement that was promulgated by an official policymaker or to "a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy." *Zarnow v. City of Wichita Falls, Tex.,* 614 F.3d 161, 169 (5th Cir. 2010) (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984)). To establish the existence of a custom or unofficial policy, a plaintiff must allege that the unconstitutional conduct occurred in cases other than his own or, in rare circumstances, that a final policymaker took a single unconstitutional action. *Id.* "A customary municipal policy cannot ordinarily be inferred from single constitutional violations." *Piotrowski*, 237 F.3d at 581.

The "policymaker" element of municipal liability requires that either actual or constructive knowledge of the custom be attributable to the municipality's governing body or to an official to whom a governing body has delegated final policy-making authority. *Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Webster*, 735 F.2d at 842). Finally, "there must be a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski*, 237 F.3d at 580. In other words, the policy must be the "moving force" behind the injury. *Id.* Without this high threshold of proof, "municipal liability collapses into *respondeat superior* liability." *Id.* (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)).

Instead of pointing to any official policy, Muslow seeks to hold the City liable for certain unconstitutional patterns or practices he claims existed within SPD. The Fifth Circuit has held that "[i]n order to find a municipality liable for a policy based on a pattern, that pattern 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of

20

city employees.'" *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 396 (5th Cir. 2017) (quoting *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009)). "A pattern requires similarity, specificity, and sufficiently numerous prior incidents." *Id.*

## B.  Municipal Liability for Failure to Discipline

In *Piotrowski*, the Fifth Circuit acknowledged that a municipal policy of inadequate police officer discipline would be unconstitutional "if it was pursued with deliberate indifference towards the constitutional rights of citizens." 237 F.3d at 581. The court stated that one indication of the existence of such a policy could be a "purely formalistic investigation in which little evidence was taken, the file was bare, and the conclusions of the investigator were perfunctory." *Id.* at 582. The court declined to find that a policy of inadequate investigation was present in *Piotrowski* because the record showed that the complaints against the officers in question had been thoroughly investigated and, more importantly, because the plaintiff offered no evidence of complaints against the officers other than her own. *Id.* The court opined that, without demonstrating a pattern of abuses, it is "nearly impossible" to hold a municipality liable for lax disciplinary policy. *Id.*

The United States District Court for the Eastern District of Louisiana has denied a municipality's motion for summary judgment under facts similar to the instant case at least twice. In *Hayward v. City of New Orleans*, the plaintiff provided evidence showing that one of the police officers she was suing for the excessive use of force had been the subject of fourteen internal complaints and seven lawsuits over a nine-year period. No. 02-3532, 2004 WL 258116 at *5 (E.D. La. Feb. 12, 2004). Thirteen of the internal complaints involved "abuse-type" allegations and most of them were withdrawn, not sustained, or dismissed. *Id.* The plaintiff also provided strong evidence showing that police supervisors thought the internal investigation process was inadequate. *Id.* The plaintiff argued that the city's inaction, after repeated complaints, "constituted an official policy of

deliberate indifference to constitutional rights under *Monell*." *Id.* at *6. The district court found that questions of fact existed as to whether city officials had notice of the abuse complaints against the officer, whether city officials were deliberately indifferent to those complaints, and whether the city's failure to train or discipline the officer was the moving force behind the plaintiff's injuries and therefore denied summary judgment on that claim. *Id.* at *7.

In *Hegeman v. Harrison*, the plaintiff alleged that the City of New Orleans and the city's superintendent failed to adequately discipline the use of unauthorized force by city police officers. No. 18-613, 2019 WL 1277523 at *12 (E.D. La. Mar. 20, 2019). In support of this claim, the plaintiff pointed to employment records showing that, in an eight-year period, eleven use of force complaints were brought against one of the officers she accused of using excessive force against her. *Id.* The plaintiff also provided evidence showing that the New Orleans Police Department received more than 8,400 complaints between the years 2013 and 2017, and over 200 of those complaints concerned the use of unauthorized force. *Id.*

The city argued that the number of prior use of force complaints did not account for those that were "unfounded" and noted that none of the investigations into the complaints filed against the officer involved in the plaintiff's case had resulted in discipline or a violation of a departmental policy. *Id.* The court rejected this argument, pointing to a previous Fifth Circuit case that refused to accept similar reasoning. *Id.* (citing *Peterson*, 588 F.3d at 852 ("[T]hat the department itself vaguely ruled most of its complaints 'not sustained' or 'unfounded' is no assurance that these investigations exonerate the City. To the contrary, that only four of the 27 complaints were 'sustained' after investigation may tilt in [the plaintiff's] favor.")). Citing *Hayward*, the court held that the amount of use of force complaints against the individual officer, and the New Orleans Police Department as a whole, created a factual issue as to whether the city's policymakers had

notice of the complaints, whether the city's investigation process was adequate, and whether the city's failure to discipline the individual officer was the "moving force" behind the plaintiff's injuries. *Id.*

### C.   Muslow's Failure to Discipline Claim

Muslow alleges that, at all relevant times, Kolb and Meyers were acting pursuant to an "expressly adopted official policy or a longstanding practice or custom of" SPD. Record Document 34, ¶ 16. Muslow claims that SPD, together with other City of Shreveport policymakers and supervisors, maintained the following unconstitutional customs, practices, and/or policies:

> (a) Employing and retaining as police officers individuals, such as Defendants Kolb and Meyers, who the Defendant City of Shreveport knew or reasonably should have known had dangerous propensities for using excessive force in conducting their official duties;
>
> (b) Inadequately supervising, training, controlling, assigning, and disciplining City of Shreveport police officers and other personnel, including Defendants Kolb and Meyers, who Defendant City of Shreveport knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits; and
>
> (c) Maintaining a policy of inaction and an attitude of indifference toward the known actions of employees of the City of Shreveport Police Department, including Defendants Kolb and Meyers, including failing to discipline, retrain, investigate, and terminate officers who participate in such behavior.

*Id.* at ¶ 17. According to Muslow, the City "condoned, tolerated and through its own actions or inactions thereby ratified such policies" and "acted with deliberate indifference to the foreseeable effects and consequences of those policies with respect to" his Fourth, Fifth, Eighth, and Fourteenth Amendment rights. *Id.* at ¶s 18–19. The Court has already dismissed Muslow's failure to train claim and any claims regarding the City's hiring practices and, as such, the Court will not consider any of the above allegations to the extent that they reassert those claims. Record Document 33, pp. 8 & 17. As in its previous ruling, the Court finds that the remainder of Muslow's assertions involve

claims that the City failed to respond appropriately once it had actual or constructive knowledge that certain police officers had dangerous propensities for using excessive force. *Id.* at 8. These claims will be grouped together and referred to collectively as Muslow's "failure to discipline" claim.

Defendants argue that Muslow cannot establish that the officers' conduct was the product of a City policy. Record Document 38-1, p. 24. In particular, Defendants argue that the internal investigation of this matter conducted by SPD was thorough, rather than perfunctory and formalistic. *Id.* at 23. Defendants point out that Muslow's complaint regarding Kolb was reviewed by seven supervisors at SPD and involved a review of Muslow's affidavit, documentation Muslow provided, Muslow's cell phone video, and interviews with Kolb, Meyers, Camp, and Brown. *Id.* at 23–24. Defendants also note that the complaint was submitted to Sergeant Rodney Horton ("Sergeant Horton"), a use of force instructor at the Shreveport Police Academy, "who determined that there was both a justifiable reason to use force and that the use of force by Officer Kolb was reasonable based on the totality of the circumstances."[5] *Id.* at 24.

1.      The Court's Previous Ruling

In its previous ruling, the Court observed that the only evidence Muslow offered in support of his failure to discipline claim was Kolb's deposition testimony establishing that previous excessive force complaints had been filed against him and that he had never been disciplined in connection with those complaints.[6] Record Document 33, pp. 8–9. Kolb also testified that there

---

[5] In connection with Muslow's complaint, Sergeant Horton only reviewed Kolb's use of force and did not evaluate the actions of Meyers. Record Document 38-4, p. 196.

[6] Although these complaints were referred to in Kolb's deposition as complaints for the excessive use of force [*see* Record Document 30-2, p. 17], the complaints filed against Kolb with SPD are technically claims that he violated SPD's own use of force policy ("SPD 601.10-Use of Force") rather than claims that Kolb violated an individual's Fourth Amendment rights. *See* Record

were four civil lawsuits, including the case at hand, pending against him for the excessive use of force.[7] Record Document 30-2, pp. 17–18. Kolb admitted to punching the three other plaintiffs in those suits in the face. *Id.* at 21–22. Pursuant to Federal Rule of Evidence 201, the Court took judicial notice of the fact that all three of those other plaintiffs alleged that their interactions with Kolb occurred in 2016, the same year as the incident in this case. Record Document 33, p. 12; *see Konrad v. Kolb, et al.*, No. 5:17-cv-00291 (W.D. La.), Record Document 14, ¶ 9;[8] *Brock v. Smith, et al.*, No. 5:17-cv-00737 (W.D. La.), Record Document 14, ¶ 6;[9] and *Tucker v. City of Shreveport, et al.*, No. 5:17-cv-01485 (W.D. La.), Record Document 1, ¶ 11. Moreover, two of the alleged incidents occurred in February and June of 2016, several months before Muslow's encounter with SPD officers in September of 2016. *Konrad*, Record Document 14, ¶ 9; *Brock*, Record Document 14, ¶ 6.

The Court found that this evidence raised questions "as to what knowledge the City had about Kolb's behavior at the time the events in this case took place and as to whether the City acted with deliberate indifference to the constitutional rights of its citizens by failing to discipline Kolb." Record Document 33, p. 13. However, the Court also observed that, unlike the plaintiffs in *Hayward* and *Hegeman*, Muslow failed to provide evidence "showing the number of internal complaints filed against Kolb, when those complaints were filed, or any details about the investigations that took place as a result of those complaints." *Id.* at 12. Ultimately, the Court found that Muslow's evidence was insufficient to survive summary judgment but elected to allow further discovery regarding his

---

Document 42-8, p. 3. Thus, these internal complaints are referred to as "use of force complaints" rather than "excessive force complaints."

[7] A fifth civil suit was filed against Kolb in January of 2019. *See Bagley v. Kolb*, No. 5:19-cv-00010 (W.D. La.), Record Document 1.

[8] *Konrad v. Kolb, et al.* has settled and is now closed. Record Document 74.

[9] *Brock v. Smith, et al.* has settled and is now closed. Record Document 30.

failure to discipline claim. *Id.* at 13. Therefore, whether that claim can survive the instant motion for summary judgment will depend on the quality of evidence Muslow has produced in conjunction with his opposition.

   2.   Muslow's New Evidence

Muslow submitted several new exhibits relevant to his failure to discipline claim, including the case files of two investigations conducted by the SPD's internal affairs bureau ("IAB"). The first involved a complaint brought by Shawn Rainey ("Rainey") against Kolb, Meyers, and two other officers for excessive force used during an arrest executed on September 9, 2015 ("Rainey file"). The second was a complaint by George Tucker ("Tucker") against Kolb and two other officers for excessive force used on November 30, 2016 ("Tucker file"). Record Documents 42-8, p. 3; 42-10, p. 2. Muslow also submits the IAB complaint history for both Meyers and Kolb ("IAB history"). Record Document 42-11.

In their reply, Defendants argue that Muslow's new exhibits are not competent summary judgment evidence and should not be considered by the Court. Record Document 49, p. 7. Defendants assert that evidence regarding any prior instances of excessive force by Kolb is inadmissible as to Muslow's excessive force claim. *Id.* The Court agrees with Defendants on this point and has not considered any prior complaints lodged against Kolb or Meyers in determining whether they violated Muslow's Fourth Amendment rights. Defendants further assert that the statements of Rainey and Tucker contained within the case files are hearsay and are therefore inadmissible under Federal Rule of Evidence 802. *Id.*

The Court holds that the statements of Rainey and Tucker contained in the IAB case files are not hearsay. Federal Rule of Evidence 801(c) defines hearsay as a statement that:

   (1) the declarant does not make while testifying at the current trial or hearing; and

26

(2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Fed. R. Evid. 801(c). Hearsay is not admissible evidence at trial, *id.* at 802, and is therefore inadmissible for summary judgment purposes, *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012). *See* Fed. R. Civ. P. 56(c)(2). However, the Court does not rely on Rainey's or Tucker's statements for the truth of the matters asserted therein. In other words, the Court does not view their statements as evidence that Kolb violated their Fourth Amendment rights. Instead, the Court views those statements as evidence that the City knew that Kolb had previously been accused of actions similar to those at issue in the instant case. Therefore, these statements are not hearsay and can be considered at the summary judgment stage.

Defendants do not object to the other portions of the Rainey or Tucker IAB files as hearsay nor do they allege that the IAB histories of Kolb and Meyers contain hearsay. Defendants merely claim that all three of these exhibits are not competent summary judgment evidence. Record Document 49, p. 7. Without any other specific legal arguments as to why the new evidence should not be considered, the Court will now evaluate whether Muslow's new evidence is sufficient to support his failure to discipline claim against the City.

3.    Evaluation of New Evidence

a.    *Previous Complaints against Kolb*

Kolb's IAB history shows that between the years 2013 and 2017, SPD received seven use of force complaints against him.[10] Record Document 42-11, pp. 5–9. The complaints of Rainey and Tucker appear to be included in that number. *Id.* at 7–8; *see* Record Documents 42-8, p. 2; 42-10, p. 2. Kolb was exonerated for three of those complaints, three were not sustained, and one was

---

[10] In contrast, Meyers's IAB history shows that he was the subject of only two use of force complaints between 2015 and 2017. Record Document 42-11, pp. 3–4.

deemed unfounded.[11] Record Document 42-11, pp. 5–9. Accounting for the shorter four-year time period, these numbers are similar to the number of complaints against the individual officers in *Hayward* and *Hegeman*, which involved fourteen internal complaints and seven lawsuits over nine years and eleven complaints over eight years, respectively. *See* 2004 WL 258116 at *5; 2019 WL 1277523 at *12. Also notable is the existence of now five civil lawsuits against Kolb, including this one, alleging notably similar conduct. *See* Record Document 30-2, pp. 16–17.[12]

This evidence indicates a pattern of behavior on the part of Kolb and raises an issue of fact as to whether the City had notice of this pattern and was deliberately indifferent to the constitutional rights of its citizens by failing to discipline Kolb. As stated above, two of the lawsuits allege that the plaintiffs' encounters with Kolb occurred in February and June of 2016, several months before Muslow's encounter with Kolb in September of 2016. *Konrad*, Record Document 14, ¶ 9; *Brock*, Record Document 14, ¶ 6. Additionally, five out of the seven use of force complaints listed in Kolb's IAB history were made before September of 2016. Record Document 42-11, pp. 5–7. The timing of those lawsuits and complaints raise questions as to what knowledge the City had about Kolb's behavior at the time the events in this case took place and, consequently, whether the City's failure to discipline Kolb was the moving force behind the violation of Muslow's rights by Kolb and/or Meyers.

---

[11] According to the IAB "Classification Definition of Administrative Investigations" chart, "Unfounded" refers to an allegation that was false or not factual, "Exonerated" means that the incident occurred but was lawful and proper, and "Not Sustained" means that there was insufficient evidence to either prove or disprove the allegations. Record Document 42-8, p. 8.

[12] Another lawsuit was filed after Kolb's deposition in which he discussed his pending lawsuits. Like the other lawsuits, it involves an allegation that Kolb punched the plaintiff in the head and face. *Bagley v. Kolb*, No. 5:19-cv-00010 (W.D. La.), Record Document 35, ¶ 6.

b.      *SPD's Previous Investigations into Complaints Against Kolb*

The Court finds that certain statements made by SPD officials contained in the Rainey file and within the IAB case file regarding Muslow's own complaint give credence to the theory that SPD was lax in its investigations into use of force complaints and failed to discipline its officers in connection with such complaints. After investigating Rainey's complaint, Sergeant J. Walker ("Walker") of the IAB recommended that Kolb's and Meyers' alleged violation of SPD's use of force policy be classified as "Not Sustained," meaning that there was insufficient evidence to either prove or disprove the allegations. Record Document 42-8, pp. 8 & 25. Walker stated that the footage from Kolb's patrol vehicle camera shows that at one point, Kolb, Meyers, and another officer were attempting to arrest Rainey, who was on the ground. *Id.* at 15. Walker reported that the video shows Meyers making kicking motions in Rainey's direction and Kolb and the other officer delivering numerous hand strikes while telling Rainey to put his hands behind his back. *Id.* As a fourth officer approached, "Kolb appear[ed] to stand up and deliver about twelve more strikes to Rainey," stop briefly, then strike Rainey four more times. *Id.* The report states that due to the quality of the video, it is unknown whether Rainey was actively resisting at this time. *Id.* Rainey can then be heard saying that he was crippled, and Kolb appears to strike Rainey six more times before the action ceases. *Id.*

In spite of his recommendation that Rainey's complaint should not be sustained, Walker wrote that he had a concern "with Officer Meyers appearing to kick Rainey and with the amount of strikes that Officer Kolb used on Rainey." *Id.* Nothing in the record suggests that Walker ever addressed his concerns regarding the use of force against Rainey with Kolb, Meyers, or anyone else at SPD. The record is similarly void of any indication that Kolb or Meyers were disciplined for their conduct. In fact, Kolb testified in his deposition, which took place two-and-a-half years after Walker's report, that he had never been disciplined in connection with any use of force complaint.

Record Document 30-2, p. 17. If SPD failed to act upon Walker's concerns that officers were using excessive force, this indicates that SPD may in fact be failing to properly discipline its officers.

The Court is also troubled by certain statements contained in the IAB file regarding Muslow's complaint. *See* Record Document 38-4, pp. 188–202. This complaint was investigated by Sergeant Diana Sanchez ("Sanchez") of the IAB, who recommended that Kolb be exonerated for his alleged violation of SPD's use of force policy based on (1) the Use of Force Overview performed by Sergeant Horton ("Horton") in which he evaluated Kolb's actions, and (2) the officers' version of events. *Id.* at 189 & 197–99. Horton concluded that Kolb's use of force against Muslow was both justified and reasonable. *Id.* at 196–97. Horton found that Kolb was justified in using force because Muslow pulled away from the officers and because of the immediate threat that someone might be injured in the home based on the neighbors' report of hearing shots fired. *Id.* at 196.

Horton's underlying rationale for concluding that Kolb's use of force was reasonable is much less apparent. Horton set forth the following elements for evaluating reasonableness:

> Some of the elements to be used as criteria when making the decision to use force and determining if the force was reasonable are ability, opportunity, and jeopardy. When I look at ability, I must determine: Did the subject have the means to do bodily harm to the officer or another person? Indicators to consider are the following: For example, age of suspect vs. age of officer, sex of suspect vs. sex of officer, size of suspect vs. size of officer, skill level of suspect vs. skill level of officer, number of suspects vs. number of officers, and relative strength of suspect vs. strength of officer.
>
> Secondly, did the subject have the opportunity to injure the officer or another person? Some indicators are positioning, proximity, and timing of the subject's actions.
>
> Lastly, did the subject's actions expose the officer to a perceived danger or was there a reasonable perception that the person would injure the officer or another person. Some indicators include the perception of imminent harm and fear of injury. Force should be used only when it is reasonable to believe that it is immediately necessary. When force in any degree is used against a suspect, the officer's actions

> will be judged in large part by whether force was reasonably necessary at the
> moment of its use based on the totality of the circumstances.

*Id.* at 196. Despite listing these factors, Horton concluded that Kolb's use of force was reasonable

without truly analyzing or applying any of them. His entire analysis on this point states:

> In my opinion, Officer Kolb's decision to use force was reasonable based on the
> totality of the circumstances. First, I looked at did the suspect have the ability to
> inflict injury [on] Officer Kolb? In my opinion, the answer is yes. Second, did the
> suspect have the opportunity to inflict injury on the officer? Again, in my opinion
> the answer is yes. Lastly, did the subject's actions expose the officer to a perceived
> danger or was there a reasonable perception that the person would injure the officer
> or another person? Once again, in my opinion, I believe that based on his statement
> to investigators and his use of force, Officer Kolb perceived that he was in jeopardy
> of receiving injury from the suspect's actions.

*Id.* at 197. The Court finds these statements to be conclusory. Horton does not provide a basis for

his conclusion that Muslow had both the ability and the opportunity to injure Kolb or that Muslow's

actions exposed Kolb to a perceived danger. Horton's conclusion that Kolb must have perceived

that he was in jeopardy because he used force and because he told investigators that he felt he was

in jeopardy represents classic circular reasoning. Had Horton applied the reasonableness factors he

enunciated, he would have found that Kolb was much larger than Muslow, knew Muslow to be

unarmed, was not faced with threatening behavior from Muslow, and that the officers on the scene

outnumbered Muslow by at least five to one. Based on Horton's own statement that "[f]orce should

be used only when it is reasonable to believe that it is immediately necessary," consideration of

those factors may have resulted in a different conclusion as to whether the use of force was

reasonable. *Id.* at 196.

Horton's use of force overview undercuts Defendants' assertion that SPD's investigation

into Muslow's complaint was thorough. Seven supervisory members of SPD reviewed Muslow's

complaint and agreed with the IAB's recommendation that Kolb should be exonerated. *Id.* at 188.

This necessarily means that all of those individuals found Horton's use of force overview to be

satisfactory. To the Court, the fact that seven SPD supervisors, including Crump, approved of Horton's opinion, despite its conclusory nature and lack of supporting facts or analysis, gives weight to Muslow's theory that SPD's internal investigations of use of force complaints are inadequate.

        4.    <u>Analysis</u>

After reviewing the new evidence Muslow has submitted, combined with the evidence that was initially presented, the Court finds that Muslow has presented sufficient evidence to survive the instant motion for summary judgment. As discussed previously, the Fifth Circuit has stated that a "purely formalistic investigation in which little evidence was taken, the file was bare, and the conclusions of the investigator were perfunctory" can be indicative of a municipal policy of inadequate officer discipline. *Piotrowski*, 237 F.3d at 582. In this case, the IAB case files of the investigations into complaints filed by Muslow and Rainey contain statements by SPD employees that a reasonable jury could regard as proof that SPD's investigations into use of force complaints were formalistic.

Defendants argue that Muslow's failure to discipline claim should not survive summary judgment because Muslow has shown only that allegations were made against Kolb, not that Kolb "actually used force deemed to be excessive." Record Document 49, p. 10. The Court assumes that Defendants are referring to the fact that SPD found that none of the complaints against Kolb warranted any discipline. However, the Court notes that SPD is not the final arbiter of the constitutionality of its officers' actions and its internal findings as to whether an officer violated its own use of force policy are not, as Defendants suggest, dispositive on these matters. Moreover, in *Peterson*, the Fifth Circuit rejected an identical argument, stating "that the department itself vaguely ruled most of its complaints 'not sustained' or 'unfounded' is no assurance that these investigations

exonerate the City. To the contrary, that only four of the 27 complaints were 'sustained' after investigation may tilt in Peterson's favor." 588 F.3d at 852. Likewise, the fact that none of the complaints against Kolb were sustained by SPD may tilt in Muslow's favor.

The Court also finds that Muslow has demonstrated a pattern of conduct on the part of Kolb. The record shows that Kolb has been the subject of seven IAB complaints and five lawsuits in the span of four years. At least two of the seven complaints and all five of the lawsuits allege that Kolb used excessive force by punching a victim in the face. This evidence shows that numerous similar complaints have been brought against Kolb for a specific behavior for which he was never disciplined. The Court also notes that Meyers's IAB history shows that he was the subject of two use of force complaints in three years. Record Document 42-11, pp. 3–4. Although not numerous enough to show a practice or pattern on their own, the complaints against Meyers, along with Walker's concerns about Meyers kicking Rainey while Rainey was on the ground, bolster Muslow's theory that SPD was lax in its officer discipline in response to excessive force complaints. Thus, Muslow has presented sufficient evidence to raise a genuine issue of material fact as to whether failing to discipline officers for the excessive use of force was a regular pattern or practice of SPD, and, by extension, the City. *See Davidson*, 848 F.3d at 396 ("A pattern requires similarity, specificity, and sufficiently numerous prior incidents.").

The Court finds that the IAB files, combined with the number of complaints and lawsuits filed against Kolb over a relatively short period of time and for similar conduct, create a genuine issue of material fact as to (1) whether SPD had a custom, pattern, or practice of failing to discipline its officers in connection with complaints regarding the excessive use of force, (2) whether the City was deliberately indifferent to the constitutional rights of its citizens to be free from the excessive use of force and (3) whether such a policy was the moving force behind the violation of Muslow's

rights. *Piotrowski*, 237 F.3d at 581–82. Thus, Defendants' motion for summary judgment [Record Document 38] is hereby **DENIED** as to Muslow's § 1983 against the City claim for failure to discipline.

### III.   Claims Against Crump

Defendants' motion does not directly address Muslow's claim against Crump in his individual capacity. In this case, a § 1983 claim for supervisory liability against Crump can only arise from his alleged failure to train or supervise SPD officers. *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). In its previous ruling, the Court dismissed any claim against Crump for the failure to train. Record Document 33, p. 17. However, the Court also found that a claim for failure to supervise was included within Muslow's failure to discipline claim. *Id.* Because the Court has denied Defendants' motion for summary judgment as to Muslow's failure to discipline claim, and because Defendants have made no separate arguments against the liability of Crump, the motion for summary judgment [Record Document 38] is hereby **DENEID** as to Muslow's supervisory liability claim against Crump.

### IV.   State Law Claims

As stated above, Muslow claims that Defendants are liable for the Louisiana state law torts of negligent hiring and/or supervision, battery, assault, and intentional infliction of emotional distress. Record Document 34, ¶s 26–50.

#### A.   Negligent Hiring and Supervision

Defendants argue that the Court should dismiss Muslow's negligent hiring and supervision claims because the Court previously dismissed Muslow's failure to train claim. Record Document 38-1, pp. 25–26. However, claims for negligent hiring and negligent supervision are separate from a failure to train claim. As to the negligent hiring claim, the Court notes that it has already dismissed

Muslow's federal claim that the City should be liable under § 1983 for its hiring practices. This claim was dismissed because Muslow had not made any previous reference to or presented any evidence regarding these hiring practices. Record Document 33, p. 8. This same lack of evidence regarding the City's hiring practices warrants a dismissal of Muslow's state law negligent hiring claim. Therefore, the Court will **GRANT** Defendants' motion for summary judgment [Record Document 38] as to Muslow's negligent hiring claim. This claim is hereby **DISMISSED WITH PREJUDICE**. However, Muslow's claim against Crump for supervisory liability has not been dismissed. Therefore, the motion [Record Document 38] is **DENIED** as to Muslow's negligent supervision claim.

### B.     Assault and Battery

Defendants' motion does not directly address Muslow's assault and battery claims. Instead, in the section of their brief discussing the use of excessive force under the Fourth Amendment, Defendants argue that "[b]ecause Louisiana employs the same standards in analyzing state law claims of excessive force as federal law . . . , both claims will be addressed simultaneously." Record Document 38-1, p. 14 n.4. The Court observes that it has previously rejected the argument that the federal and Louisiana law standards for analyzing excessive force claims are the same. *Tucker v. City of Shreveport*, No. 17-1485, 2019 WL 961993, at *12–*13 (W.D. La. Feb. 27, 2019). In any event, the Court has determined that a genuine issue of material fact exists as to whether Kolb and Meyers used excessive force when they arrested Muslow. Thus, Defendants' argument that the assault and battery claims should be dismissed fails and the motion for summary judgment [Record Document 38] is **DENIED** as to those claims.

C.       **Intentional Infliction of Emotional Distress**

Muslow claims that Defendants are liable for intentional infliction of emotional distress ("IIED"). Record Document 34, ¶s 36–41. In order to recover for IIED in Louisiana, a plaintiff must establish "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991). The conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

Defendants argue that Muslow's IIED claim must be dismissed because Kolb and Meyers took actions that were objectively reasonable in accordance with their training and therefore could not be considered "extreme and outrageous" and because there is no evidence that Kolb or Meyers desired to inflict emotional distress upon Muslow or knew that severe emotional distress would be certain to result from their conduct. Record Document 38-1, p. 26. In response, Muslow argues that Kolb and Meyers knew that their actions would cause him emotional distress, pain, and suffering and that any reasonable officer would consider their conduct extreme and outrageous. Record Document 42, p. 14. Muslow also provides testimony showing that he developed symptoms consistent with Post-Traumatic Stress Disorder following this incident. *Id.* (citing Record Document 42-6, p. 2).

Although the Court has determined that questions of material fact exist as to whether Kolb and Meyers violated Muslow's constitutional rights, the Court finds that Muslow's IIED claim cannot survive summary judgment because the record is void of facts demonstrating that Kolb or

Meyers "desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from [their] conduct." *White*, 585 So. 2d at 1209. A defendant can only be liable for IIED when the conduct is "intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like." *Id.* at 1210. As other district courts have found, the existence of a genuine issue of fact as to a plaintiff's excessive force claim does not require a finding that there is also a genuine issue of fact as to that plaintiff's IIED claim.

In *Curran v. Aleshire*, the court denied summary judgment on the plaintiff's § 1983 excessive force claim, but granted summary judgment as to her IIED claim. 67 F. Supp. 3d 741 (E.D. La. 2014). The court stated that it could not find "in the allegations or the record any claim or evidence" that the defendant desired to inflict severe emotional harm or knew that such harm would result from his conduct. *Id.* at 754–55. As such, the court found that summary judgment should be granted on the IIED claim "[e]ven assuming that there is a material issue of fact as to the other factors." *Id.* at 755. Likewise, in *Badie v. City of New Orleans*, the court denied summary judgment as to the plaintiff's § 1983 excessive force claim that a police officer wrapped taser wire around his wrists and hit him in the head with the taser gun after he had been handcuffed but granted summary judgment as to the plaintiff's IIED claim arising out of this incident. 11-2991, 2013 WL 5175648, at *6 (E.D. La. Sept. 12, 2013). The court found that the plaintiff "offer[ed] nothing to support that [the officer] desired to inflict severe emotional distress or knew or was substantially certain that such distress would result." *Id.* at *7. Like the courts in *Curran* and *Badie*, this Court finds that Muslow's IIED claim cannot survive summary judgment without any evidence as to the intent of Kolb or Meyers. Because Muslow will bear the burden of proving this claim at trial, Defendants need not produce evidence to negate the elements of the Muslow's IIED claim; rather,

they need only point out the absence of supporting evidence, which they have done. *Celotex*, 477 U.S. at 322–23. Therefore, Defendants' motion for summary judgment [Record Document 38] is **GRANTED** as to Muslow's IIED claim. This claim is **DISMISSED WITH PREJUDICE**.

<u>CONCLUSION</u>

For the foregoing reasons, the motion for summary judgment [Record Document 38] is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to Muslow's state law tort claims of negligent hiring and intentional infliction of emotional distress. Those claims are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** as to all of Muslow's remaining claims.

**THUS DONE AND SIGNED** this 30th day of September, 2020.

ELIZABETH E. FOOTE
UNITED STATES DISTRICT JUDGE